IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT GALLAGHER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 18-cv-07556 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| CASE NEW HOLLAND, INC., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Robert Gallagher worked as an Engine Teardown Specialist at Case New Holland, Inc. ("CNH") until his termination in June 2018. He alleges that Defendant CNH unlawfully terminated him because of his age. Gallagher subsequently sued CNH for age discrimination, asserting a claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*. CNH now moves for summary judgment. (Dkt. No. 85.) For the following reasons, CNH's motion is granted.

BACKGROUND

Unless otherwise noted, the following facts are undisputed.[1]

**I.  Relationship between the Parties**

CNH contracts with Bartech Workforce Management ("Bartech") to oversee its relationship with individuals employed by workforce staffing agencies who are working at CNH.

---

[1] In addition to his age discrimination claim, Gallagher also originally brought a state law conversion claim against CNH. (Am. Compl. ¶¶ 23–31, Dkt. No. 49.) However, in his response to CNH's summary judgment motion, Gallagher states that he will not further pursue his conversion claim further and plans to voluntarily dismiss that claim with prejudice. (*See* Pl.'s Resp. in Opp'n of Def.'s Mot. for Summ. J. at 10, Dkt. No. 92.) Accordingly, the Court does not address the conversion claim or recount the facts relating to that claim.

(Pl.'s Resp. to Def.'s Statement of Facts ("PRDSF") ¶ 2, Dkt. No. 93.) For instance, Bartech identifies workforce staffing agencies that can provide suitable candidates for CNH when CNH has a temporary staffing need; Bartech then reviews and forwards potential promising contractors to CNH. (*Id.* ¶¶ 3–4.) CNH and Bartech have a Master Services Agreement, stating that Bartech is responsible for paying the workforce staffing agencies for the services that contractors perform for CNH, and CNH may require Bartech to terminate the assignment of any contractor without cause and without notice. (*Id.* ¶ 5.) Ageatia Global Solutions ("AGS"), which was Gallagher's workforce staffing agency, has a Supplier Master Services Agreement with Bartech. (*Id.* ¶¶ 6–7, 15, 18.) The agreement provides that all of CNH's requests for potential contractors and related matters will be handled by Bartech; AGS is the contractor's employer and is responsible for the contractor's wage payments and benefits; Bartech and CNH can terminate a contractor's assignment for any reason; and AGS will remove the contractor from the assignment upon CNH's request. (*Id.* ¶ 7.)

In late 2016, CNH determined that it needed two Engine Teardown Specialists ("ETS") to assist with a backlog of engines that required teardown at its Burr Ridge facility; they would also have staggered start dates. (*Id.* ¶ 14.) CNH classifies an ETS as a contractor employed by a workforce staffing agency; their duties are to dismantle, photograph, and record problems with old, previously failed engines. (*Id.* ¶¶ 9, 12.) Additionally, an ETS is intended only to work at CNH for a limited duration; specifically, to reduce the backlog of engines requiring takedown. (*Id.* ¶ 13.) Because of Gallagher's prior experience with diesel engines, AGS submitted his name and information to Bartech as a potential candidate for the ETS position. (*Id.* ¶ 15.) Dale Bara, a CNH quality engineer and Burr Ridge's team lead for engine teardown and analysis, interviewed

2

Gallagher and recommended him to CNH's senior manager Massimo Cappi; Cappi then approved the decision. (*Id.* ¶¶ 16–17.)

On September 11, 2017, AGS sent an employment offer letter to Gallagher, noting that he was an at-will employee. (*Id.* ¶ 18.) Gallagher's employment agreement with AGS required Gallagher to engage in professional and respectful behavior and prohibited him from using CNH's equipment and work time for personal use. (*Id.* ¶ 20.) Gallagher also completed Bartech's Attestation of Contingent Worker Status and Benefits Waiver, which stated that he was an employee of the staffing agency, he was not an employee of Bartech, and he was not an employee of CNH. (*Id.* ¶ 22.) In addition, Gallagher acknowledged CNH's Contractor Agreement, which declared that he would act as an independent contractor, not as an employee or agent of CNH. (*Id.* ¶ 23.)

At the time of his start date with CNH, Gallagher was sixty-five years old. (*Id.* ¶ 19.) Gallagher began working at Burr Ridge as an ETS on September 18, 2017. (*Id.* ¶ 24.) CNH gave him two shift options for his work schedule. (*Id.* ¶ 25.) Bara provided Gallagher with his work assignments, training on engine teardown, and feedback on his work performance. (*Id.*) CNH provided Gallagher with the tools to perform his work and was responsible for the all the costs of Gallagher conducting his work. (Def.'s Resp. to Pl.'s Statement of Additional Facts ("DRPSAF") ¶ 98, Dkt. No. 96.) But CNH did not maintain a personnel file for Gallagher, nor did it use formal discipline procedures, such as written reprimands, allegedly because Gallagher was only a contractor. (PRDSF ¶ 26.)

From September 2017 to June 2018, Gallagher was the only ETS managing the engine backlog. (DRPSAF ¶ 105.) In April and May 2018, CNH requested that Bartech find a second ETS in accordance with CNH's plan to stagger the start dates of the two contractors. (PRDSF

3

¶ 74.) CNH interviewed and hired Travis Nelson, a twenty-eight-year-old, on June 12, 2018—two days before terminating Gallagher. (*Id.* ¶¶ 73–77.) Nelson's job responsibilities were the same as Gallagher's duties. (DRPSAF ¶ 106.)

## II. Incidents at CNH and Gallagher's Termination

During Gallagher's time there, CNH asserts that he had several performance-related issues, including "poor quality of teardown activities, poor time management and inefficiency, unsafe work practices, engagement in inappropriate non-work related conversations, insubordination, and sleeping at his workstation." (PRDSF ¶ 27.) Gallagher denies having any such problems; instead, he contends that he performed his job duties without complaint or reprimands. (*Id.*)

First, CNH claims that Gallagher made racially inappropriate remarks to Bara and another employee "directed towards African Americans on the issues of police brutality and the death of an African American individual." (*Id.* ¶ 28.) CNH alleges that Gallagher used racial slurs during this conversation, including "n*****", and Bara verbally reprimanded him in response. (*Id.* ¶¶ 29–30.) CNH claims that on another occasion, Gallagher used the ethnic slur "sp*cks" in reference to Hispanics, and Bara again verbally reprimanded Gallagher as a result. (*Id.* ¶ 32.) Gallagher denies making these remarks and slurs or receiving verbal reprimands from Bara. (*Id.* ¶¶ 28–32.)

CNH next contends that employees raised concerns about Gallagher's time management and efficiency. For instance, CNH asserts that an employee caught Gallagher sleeping at his workstation. (*Id.* ¶ 34.) CNH also claims that Cappi became frustrated with Gallagher's poor time management and inefficiency and the poor quality of his engine teardowns, such as Gallagher failing to meet his weekly targets for engine teardowns. (*Id.* ¶¶ 35–36.) Subsequently, according

4

to CNH, Bara informed Gallagher that he needed to conduct his engine analysis faster, but Gallagher made "off-the-cuff remarks" and did not heed Bara's instruction. (*Id.* ¶ 37.) Gallagher disputes sleeping at his workstation or receiving criticism from Bara and Cappi concerning his performance. (*Id.* ¶¶ 34–37.)

To the contrary, Gallagher claims that CNH never informed him that his pace of engine teardowns was insufficient nor did they provide him with reports regarding the number of engines to be torn down and the progress in clearing any backlog. (DRPSAF ¶ 82.) Gallagher also asserts that Bara told him to slow down because he was finishing engine teardowns faster than other CNH employees could complete the necessary reports. (*Id.* ¶ 84.) Gallagher further contends that Bara blamed the engine backlog on the lack of sufficient personnel to address the issue due to CNH's hiring freeze. (*Id.* ¶ 85.) CNH admits that Gallagher never received specific weekly targets for the number of engines to be torn down but disputes Gallagher's other assertions. (*Id.* ¶¶ 82, 84–85.)

CNH further claims that Gallagher received two citations for safety violations and lied to Jason Gedmin, CNH's Lead Engine Test Technician, when he was confronted about them. (PRDSF ¶¶ 38–47.[2]) First, CNH claims that Gedmin received a report that Gallagher dropped an

---

[2] Gallagher argues that, for both incidents, CNH relies on layers of inadmissible hearsay. Specifically, CNH relies on the affidavit of Michelle Altilio, CNH's Human Resource Business Manager, whose testimony is based on an email from Gedmin to her, documenting the incidents and reports he received from other test team technicians regarding their observations. In response, CNH contends that the testimony is admissible under the business records exception. The Court doubts that the testimony is admissible under the business records exception, which requires that the record be made at or near the time of an event, and the record be kept in the course of a regularly conducted business activity. *See* Fed. R. Evid. 803(6). Nonetheless, the Court concludes that Gedmin's email to Altilio is not hearsay because it is not being offered to prove the truth of the matter asserted in the statement. *See* Fed. R. Evid. 801(c)(2). Instead, it is being offered to show the record of complaints about Gallagher's performance. Even if Gedmin's email were offered for the truth of the matter asserted, the test team technicians' reports to Gedmin about their observations likely qualify as present sense impressions, depending on when the statements were made. *See* Fed. R. Evid. 803(1). Additionally, the portions of Gedmin's email recounting his discussion with Gallagher contain alleged statements by Gallagher, which would likely qualify as an opposing party's statement and thus not hearsay. *See* Fed. R. Evid. 801(d)(2). Depending on whether

5

engine head, and then Gallagher lied to Gedmin about the incident. (*Id.* ¶¶ 39, 40, 42–43.) Next, CNH contends that Gedmin observed Gallagher wearing inappropriate footwear and that, when confronted, Gallagher lied about wearing the proper safety toe boots. (*Id.* ¶¶ 44–47.) Gedmin reported these alleged incidents to Michelle Altilio, CNH's Human Resource Business Manager. (PRDSF ¶ 47; Def.'s Statement of Material Facts ("DSMF"), Ex. 2, at 66–67, Dkt. No. 86-2.) Gallagher, however, denies receiving citations for safety violations, lying to Gedmin, dropping an engine head on the ground, or wearing improper footwear. (PRDSF ¶¶ 38, 40–47). He does admit, however, that Gedmin received a report that he dropped an engine head. (*Id.* ¶ 39.)

Finally, CNH asserts that it received a complaint from CNH employee Patti Waters about Gallagher engaging in inappropriate conversations. (*Id.* ¶¶ 48, 50.) Specifically, CNH submits that Gallagher made "personal, derogatory attacks on Waters" and her Roman Catholic religion, and he refused to end those attacks even after Waters's repeated requests for him to stop. (*Id.* ¶¶ 50–51.) Consequently, CNH asserts that Waters informed Bara about Gallagher's inappropriate conversations and harassment regarding her religious beliefs; Bara then allegedly recommended that Waters make a formal complaint to Human Resources. (*Id.* ¶ 52.) On June 11, 2018, Waters emailed Altilio about Gallagher's alleged misconduct. (*Id.* ¶ 52.) Subsequently, Altilio allegedly interviewed Waters regarding her interactions with Gallagher. (*Id.* ¶ 54.) Gallagher admits that Waters complained about him in her email to Altilio but denies harassing Waters about her religious beliefs, disparaging her religion, or engaging in inappropriate discussions with her. (*Id.* ¶¶ 48–53.)

---

Gedmin recalls the events well enough to testify fully and accurately, Gedmin's statements in the email could also qualify as recorded recollections. *See* Fed. R. Evid. 803(5); *see also Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (internal quotation marks omitted) ("To be considered on summary judgment, evidence must be admissible at trial, though the form produced at summary judgment need not be admissible.").

On June 13, 2018, Altilio emailed Cappi recommending that CNH end Gallagher's assignment because of the increase in complaints concerning him; Altilio also requested that Cappi provide her with additional documentation regarding Gallagher's poor performance. (*Id.* ¶ 55.) Cappi responded that Gallagher had the following performance issues: (1) quality of engine teardowns fell below expectations; (2) continuous engagement in lengthy non work-related conversations; (3) organization and cleanliness fell below expectations; (4) unsafe work practices; (5) inability to follow supervisor's specific directions; (6) failure to seek out new assignments and notify supervisor when assigned work was completed; and (7) sleeping at work station. (*Id.* ¶ 56.) CNH then terminated Gallagher's assignment on June 14, 2018, and tasked Bartech with informing him. (*Id.* ¶ 57.) Bartech's stated reason for ending Gallagher's assignment was "poor performance and lack of time management and spending too much time socializing." (*Id.* ¶ 58.) At the time of Gallagher's termination, he was sixty-six years old. (*Id.* ¶ 61.)

### III. Events Following Gallagher's Termination

Following his termination, CNH claims that Gallagher left threatening and harassing voicemail messages for Joseph Elsman, a CNH employee. (*Id.* ¶ 62.) CNH also asserts that CNH employees observed Gallagher conducting surveillance of the Burr Ridge facility, such as monitoring and photographing employees and personnel. (*Id.* ¶ 63.) Gallagher admits to leaving two voicemail messages for Elsman but denies that they were unlawful, threatening, or harassing; rather, he contends that the messages indicated that he was considering legal action. (*Id.* ¶ 62.) Additionally, Gallagher admits to being present outside of CNH's property but disputes that his activities constituted "surveillance." (*Id.* ¶ 63.) He asserts that his purpose was to identify witnesses who might have had relevant information about his termination. (DRPSAF ¶ 96.) CNH later contacted the Burr Ridge Police Department and sent Gallagher a cease-and-desist letter on

7

July 11, 2018. (PRDSF ¶ 65.) Police did not arrest or ticket Gallagher for his activities. (DRPSAF ¶ 96.)

In October 2018, Gallagher filed a charge of discrimination with the Equal Employment Opportunity Commission, which issued a right to sue letter. (Am. Compl. ¶ 22.) Gallagher then sued CNH, alleging that CNH unlawfully terminated him in violation of the ADEA.

## DISCUSSION

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). While facts and reasonable inferences are construed in the light most favorable to the non-moving party, such "favor . . . does not extend to drawing inferences that are supported by only speculation or conjecture." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (internal quotation marks omitted). The Court grants summary judgment when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).

### I.      Employer Under the ADEA

The ADEA prohibits an employer from discharging an individual because of their age. 29 U.S.C. § 623(a). CNH first contends that it is entitled to summary judgment because CNH was not Gallagher's actual or joint employer; instead, AGS was his sole employer.

8

To determine the existence of a joint employer relationship, courts in this Circuit consider the following factors:

> (1) the extent of the employer's control and supervision over the employee, including directions on scheduling and performance of work; (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace; (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations; (4) method and form of payment and benefits; and (5) length of job commitment and/or expectations.

*Frey v. Coleman*, 903 F.3d 671, 676 (7th Cir. 2018) (quoting *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378–79 (7th Cir. 1991)). "A plaintiff need not establish that every *Knight* factor falls in [their] favor" to survive summary judgment. *Frey*, 903 F.3d at 681 (determining that an employment relationship likely existed where the first, second, and fifth *Knight* factors weighed in the plaintiff's favor); *Howard v. Cook Cnty. Sheriff's Off.*, No. 17 C 8146, 2022 WL 1404833, at *8 (N.D. Ill. May 4, 2022) (concluding that a reasonable jury could find an employment relationship existed where the first, third, and fifth *Knight* factors weighed in the plaintiff's favor).

An employer's degree of control is the most important factor and must be afforded the greatest weight. *Id.* at 679 (finding that the first *Knight* factor weighed in favor of an employment relationship where the defendant hired and fired the plaintiff, determined her compensation and benefits, supervised, scheduled, and trained her, and evaluated her work). The "key powers" for the first *Knight* factor are hiring and firing. *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 929 (7th Cir. 2017). A putative employer's minimal supervision of a worker that is limited to the "result to be achieved" thwarts a finding of control. *See Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 703 (7th Cir. 2015).

The Court finds that first *Knight* factor weighs in favor of Gallagher. While CNH concedes that it supervised Gallagher, trained him on the process of engine teardown, and gave

9

him his work assignments, it emphasizes that it did not set Gallagher's schedule or directly pay his compensation and benefits. But hiring and firing are the most important considerations for this factor. Here, it is undisputed that CNH played a significant role in Gallagher's hiring and termination. For instance, CNH made the decision to hire Gallagher for the ETS position after receiving his information from Bartech, a CNH employee interviewing him, and senior management approving the decision. In response, AGS offered Gallagher employment with AGS. Similarly, the Supplier Master Services Agreement between AGS and Bartech indicated that CNH could end a contractor's assignment for any reason, and AGS must then remove the contractor from the assignment. It is uncontested that CNH decided to remove Gallagher from the assignment, and AGS subsequently complied with this decision.

Moreover, CNH controlled most of Gallagher's work environment. In addition to making the decisions to hire and fire him, CNH provided Gallagher with his work assignments, instructed him on engine teardown, supervised him, and evaluated his work performance. Despite Gallagher choosing his specific schedule, CNH only gave him the option to choose between two shifts, 7 a.m. to 4 p.m. or 8 a.m. to 5 p.m. Considering all these facts together, the first, and most important, factor points to CNH as Gallagher's employer.

The second *Knight* factor—the type of occupation and nature of skills required—also supports a finding of an employee-employer relationship. "If important job skills were obtained in the putative employer's workplace, this suggests an employment relationship." *Bridge v. New Holland Logansport, Inc.,* 815 F.3d 356, 362 (7th Cir. 2016) (citation omitted). Here, Gallagher had prior experience with diesel engines but obtained the specialized skills for how to conduct engine teardowns from his training at CNH. This factor thus favors Gallagher.

10

Additionally, the third *Knight* factor—responsibility for the costs of operation— weighs in Gallagher's favor. It is undisputed that CNH was in charge of operations at the Burr Ridge property, was responsible for the costs of Gallagher performing his work, and provided Gallagher with the necessary tools to conduct his work. However, the fourth *Knight* factor—responsibility for the payment of salary and benefits—weighs in CNH's favor. CNH did not directly pay Gallagher's wages or benefits. Rather, CNH paid Bartech, which paid AGS for Gallagher's services; AGS also provided Gallagher with employee benefits.

Finally, the fifth *Knight* factor—length of job commitment or expectations—weighs in CNH's favor. CNH did not hire Gallagher as a long-term employee. Instead, CNH hired Gallagher for a limited purpose and the discrete task of reducing the backlog of engines requiring teardown. *See Frey*, 903 F.3d at 680 ("This was not a temporary assignment or a contract job that would end at the completion of some task.").

In sum, three of the five *Knight* factors, the most significant of which is CNH's degree of control and supervision over Gallagher, support a finding of an employer-employee relationship. As a result, the Court concludes that a reasonable jury could find that CNH was Gallagher's employer along with AGS. CNH is not entitled to summary judgment that ground.

## II. Merits of Age Discrimination Claim

The Court next addresses whether Gallagher can show that CNH discriminated against him because of his age. The ADEA extends protection to workers age 40 or older, 29 U.S.C. § 631(a), and makes it unlawful "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §§ 623(a)(1). The ADEA requires age to be the "but-for" cause of the challenged adverse employment action. *Igasaki v. Ill. Dep't of Fin. & Pro.*

*Regul.*, 988 F.3d 948, 960 (7th Cir. 2021); *Carson v. Lake County*, 865 F.3d 526, 532 (7th Cir. 2017). "An ADEA plaintiff may proceed by introducing direct or circumstantial evidence that [his] employer took an adverse action against [him] because of her age. Alternatively, a plaintiff may proceed through the burden-shifting framework adapted from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Carson*, 865 F.3d at 532–33 (internal citations omitted). Whichever approach the plaintiff elects, the ultimate inquiry at the summary judgment stage is the same: "the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action ***because*** of [his] age." *Id.* at 533 (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). Thus, in Gallagher's case, the "sole question that matters" is whether a reasonable juror could find that Gallagher would have kept his job if he was younger and everything else had remained the same. *Ortiz*, 834 F.3d at 764; *Perry v. Dep't of Hum. Servs.*, 345 F. Supp. 3d 1019, 1026–27 (N.D. Ill. 2018), *aff'd*, 793 F. App'x 440 (7th Cir. 2020).

      A.    *McDonnell Douglas* Test

Gallagher does not put forward any direct evidence that he was fired because of his age; for instance, he does not offer any evidence that his supervisors or coworkers commented on his age. Instead, to establish his claim, Gallagher relies on the burden-shifting approach under *McDonnell Douglas*.

To establish a *prima facie* case of age discrimination under *McDonnell Douglas*, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate employment expectations at the time of his termination; (3) he suffered an adverse employment action despite meeting the employer's expectations; and (4) he was treated less favorably than similarly situated younger employees. *Igasaki*, 988 F.3d at 957; *Peele v.*

*Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). If Gallagher establishes a *prima facie* case, CNH must then present a nondiscriminatory reason for his termination. *Igasaki*, 988 F.3d at 957. If CNH does so, then Gallagher must present evidence that CNH's proffered explanation was pretextual. *See id.* Here, it is undisputed that Gallagher belongs to the protected class of employees that are at least 40 years of age. It also undisputed that Gallagher suffered an adverse employment action—*i.e.*, termination. Thus, Gallagher's ability to establish a *prima face* case of age discrimination turns on whether he can show that he was meeting CNH's legitimate employment expectations and that he was treated less favorably than similarly situated younger employees.

### 1. Legitimate Employment Expectations

The legitimate expectations inquiry is not confined to a consideration of whether a plaintiff's actual job performance was adequate; rather, factfinders may also assess factors such as insubordination and workplace camaraderie. *See Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) (citing *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007)).

Although his evidence is not overwhelming and relies heavily on his own account of events, the Court finds that Gallagher done enough to create a genuine dispute of material fact about whether his job performance met CNH's legitimate expectations. Specifically, Gallagher denies using ethnic slurs, making racially inappropriate remarks, insulting or harassing Waters about her religion, receiving verbal reprimands, receiving criticism about the quality and pace of his engine teardowns, engaging in unsafe work practices, or sleeping at his workstation. CNH argues that Gallagher should not be permitted to rely on his own self-assessment of his performance and a self-serving declaration to survive summary judgment. But evidence presented in the form of "self-serving" testimony can be sufficient to defeat a summary judgment motion.

*See McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 814 (7th Cir. 2017); *Whitaker v. Wis. Dep't of Health Servs.*, 849 F.3d 681, 685 (7th Cir. 2017). Still, conclusory statements will not create an issue of fact. *See Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010); *Phillipson v. McAleenan*, No. 14-CV-08138, 2019 WL 4749909, at *7–8 (N.D. Ill. Sept. 30, 2019), *aff'd sub nom. Phillipson v. Wolf*, 831 F. App'x 212 (7th Cir. 2020) (noting that the plaintiff's assertion of superior job performance was contradicted by the substantial record of poor performance). Here, however, Gallagher does not rely just on conclusory statements about his adequate job performance; instead, he attempts to debunk each of CNH's allegations by denying that specific events occurred or by providing explanations for his behavior. For instance, Gallagher denies conducting engine teardowns too slowly by asserting that he was never given weekly targets for engine teardowns, that Bara told him to slow down because his pace was too fast for other CNH personnel to complete reports, and that Bara blamed the engine backlog on CNH's hiring freeze rather than on Gallagher's performance. Viewing the evidence in the light most favorable to Gallagher, a reasonable jury could credit Gallagher's explanations and conclude that he was meeting CNH's employment expectations.

### 2. Less Favorable Treatment

The Court turns next to the question of whether Gallagher can show that he was treated less favorably than similarly situated younger employees. "Precise equivalence" is not required for the similarly situated inquiry, but "[a] similarly situated employee must be directly comparable to [the] plaintiff[] in all material respects." *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 575 (7th Cir. 2021) (internal quotation marks omitted). In assessing whether employees are similarly situated, relevant factors include whether the proffered employee held the same job position, reported to the same supervisor, was subject to the same standards, and engaged in

14

similar conduct. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014) (citation omitted). A fellow employee is not similarly situated to the plaintiff if they do not have a similar disciplinary history and performance record. *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 662 (7th Cir. 2016) (citation omitted); *see also Zayas*, 740 F.3d at 1158 (concluding that the plaintiff failed to produce a similarly situated comparator since the proffered comparator had not engaged in similarly unprofessional communications and was not disciplined).

      In this case, Gallagher has failed to present evidence that younger CNH employees in the ETS position were treated more favorably than he was treated. Gallagher claims that Nelson, a 28-year-old ETS hired shortly before Gallagher was fired, is a similarly situated employee because they had the same position and performance record when Gallagher's disputed performance deficiencies are disregarded. This argument is unavailing because it is undisputed that Nelson did not have any allegations of performance issues or misconduct, such as verbal reprimands for making inappropriate remarks, accusations of harassing another employee, or criticisms on the quality of his engine teardowns. (PRDSF ¶ 78.) Even disregarding the disputed performance issues, Gallagher does not contest that Gedmin received a report about him allegedly dropping an engine head or that Waters complained to Altilio about Gallagher making inappropriate remarks. Nelson cannot be a sufficient comparator since he does not have similar allegations of misconduct or poor performance.

      Aside from Nelson, Gallagher presents no evidence regarding any other younger, similarly situated employer. Because Gallagher has failed to provide evidence of similarly situated younger employees, he has failed to set out a *prima facie* case under the *McDonnell Douglas* framework and CNH is entitled to summary judgment.

### 3. Pretext

But even if Gallagher had established a *prima facie* case under *McDonnell Douglas*, he would still fail to demonstrate that CNH's stated nondiscriminatory reasons for terminating him were pretextual. When assessing pretext, "the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011) (citation omitted). To demonstrate that the employer's reasons are not credible, an employee may introduce evidence showing that the proffered reasons had no factual basis, were insufficient to warrant discharge, or did not actually motivate his discharge. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014). Specifically, the plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the defendant's proffered reasons that a reasonable person could find them unworthy of credence and hence infer that the defendant did not act for the asserted non-discriminatory reasons." *Id.* (internal quotation marks omitted). A plaintiff must show that the employer is lying for each of its stated reasons unless one reason is so "fishy and suspicious as to cast doubt on them all." *Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009).

CNH's stated reasons for firing Gallagher were his numerous alleged performance issues, including "poor quality of teardown activities, poor time management and inefficiency, unsafe work practices, engagement in inappropriate non-work-related conversations, insubordination, and sleeping at his workstation." (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. at 11, Dkt. No. 87.) Gallagher argues that he has raised a dispute of material fact concerning pretext because he specifically refutes the alleged performance deficiencies, thereby calling into question the honesty of CNH's beliefs.

Gallagher cites *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1460–61 (7th Cir. 1994), for the proposition that a detailed refutation of events underlying an employee's claimed performance deficiencies is sufficient to create a factual issue as to whether the employer honestly relied on the purported deficiencies when making its decision. In *Dey*, the Seventh Circuit concluded that a reasonable jury could find that the employer fabricated its reason of poor performance for the plaintiff's discharge because the plaintiff denied that certain events occurred, the employer terminated her four weeks after she complained of sexual harassment, and the employer gave her a raise—without mentioning any performance deficiencies—two weeks before terminating her. *See Dey*, 28 F.3d at 1458, 1461. But the suspicious timing of the *Dey* plaintiff's termination—*i.e.*, shortly after she complained about sexual harassment—renders it inapposite for purposes of Gallagher's case.

Furthermore, it is undisputed that Waters complained to Altilio, claiming that Gallagher had engaged in inappropriate workplace conversations. (PRDSF ¶ 53.[3]) The undisputed record also reflects that Gedmin received a report that Gallagher dropped an engine head on the ground. (*Id.* ¶ 53.) Gedmin then notified Altilio of this alleged incident. (PRDSF ¶ 47; DSMF, Ex. 2, at 66–67.) Despite Gallagher contesting the accuracy of the allegations underlying the complaint and

---

[3] Waters wrote:

> There have been numerous times personally that Robert [Gallagher] has started conversations and when it started leading to areas of religious, political or of a social nature that I did not feel were appropriate workplace conversations, I told him how I felt and terminated conversation. I believe he has tried to instigated [sic] political and social conflict in the workplace that could potentially have a negative impact on CNH Industrial. I try to avoid any communication with him, but unfortunately he still has these conversations with others in the office and it has become quite distracting. There have been a couple of times that myself and others have asked him to take the conversations outside of the office, but it didn't seem to have much impact . . . . I brought this to the attention of Dale Bara earlier today. Dale suggested that I contact you reporting my concerns.

(DSMF, Ex. 9, at 6–7, Dkt. No. 86-9.)

report, Gallagher's acknowledgement of the existence of the complaint and report undermine his pretext argument and contention that his age was, in fact, the but-for cause of his termination. To establish pretext, Gallagher must show that CNH is lying with respect to all of its proffered explanations—which he cannot do based on the record before the Court. *See Simpson*, 827 F.3d at 662–63 (finding that an employer's reasons for firing the plaintiff were not pretextual where the plaintiff disputed the accuracy of the accusations leading to the reprimands, but did not contest the fact that management received complaints about her, and she failed to produce evidence that the reprimands were not what caused the decisionmaker to discharge her).

Perhaps Gallagher's strongest evidence of pretext is that CNH did not contemporaneously document his alleged performance issues but instead waited until after Altilio recommended to Cappi that CNH end Gallagher's assignment. As noted above, in her email recommending termination, Altilio asked Cappi to send additional documentation supporting Gallagher's poor performance. (PRDSF ¶ 55.) In response, Cappi sent a list of Gallagher's alleged seven areas of performance issues. (PRDSF ¶ 56; DSMF, Ex. 2, at 72–73.) That formal documentation of Gallagher's alleged performance deficiencies occurred only after Altilio recommended terminating him could be suggestive of pretext. But Cappi's June 2018 email is not the only documentation for at least one of Gallagher's alleged performance issues: Gedmin reported Gallagher's purported safety violations in April 2018. (DSMF, Ex. 2, at 66–67.)

Moreover, the email exchange between Cappi and Altilio itself undermines any suggestion of pretext. Altilio emailed Cappi two days after receiving Waters's complaint. (PRDSF ¶¶ 53–55.) In Altilio's initial email, she noted that she had received "increasing complaints" about Gallagher and she and Cappi had previously discussed his performance issues. (DSMF, Ex. 2, at 66–67.) Altilio also asked whether Cappi had any objections to ending Gallagher's assignment.

18

(*Id.* at 67.) On the next day, CNH decided to remove Gallagher from his CNH assignment. (PRDSF ¶ 57.) CNH's prompt action after receiving Waters's complaint supports CNH's contentions that Waters's complaint spurred their decision to terminate Gallagher and that they honestly believed that Gallagher had made inappropriate remarks. Moreover, Altilio's query to Cappi, regarding whether he had any objections to terminating Gallagher, also suggests that CNH's decision to terminate Gallagher was not already predetermined.

In sum, Gallagher has failed to produce sufficient evidence that CNH did not honestly believe at least one of its stated reasons for terminating him. Accordingly, no reasonable jury could find that CNH's stated reasons for terminating Gallagher was pretextual.

### B. Reviewing the Evidence as a Whole

Aside from the more formulaic, burden-shifting approach of *McDonnell Douglas*, a plaintiff may also defeat a motion for summary judgment by relying on a holistic approach to the evidence to show that a "reasonable factfinder" could conclude that the plaintiff's protected classification "caused the discharge." *Ortiz*, 834 F.3d at 765; *Perry*, 345 F. Supp. 3d at 1030–31 (finding that the plaintiff failed to show age was the determinative factor in his termination where the decisionmaker made an isolated remark about "getting rid of old-timers" but the plaintiff had a history of disciplinary incidents). For this assessment, "court[s] must evaluate all evidence together as a whole, whatever the source." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021).

Here again, Gallagher has produced insufficient evidence that his age contributed to his termination. He points to no evidence of age animus by his supervisors or any other employee at CNH. Instead, Gallagher supports his age discrimination claim by contesting his alleged performance deficiencies and emphasizing that CNH hired a 28-year-old as Burr Ridge's second

19

ETS two days before terminating him. Even ignoring the disputed performance issues, there is uncontroverted evidence that CNH received a serious complaint about Gallagher engaging in inappropriate discussions and a report that Gallagher had engaged in an unsafe work practice. Considering these facts, a reasonable factfinder could not conclude that Gallagher's age was the but-for cause of his termination. As a result, summary judgment for CNH is appropriate.

## CONCLUSION

For the foregoing reasons, CNH's motion for summary judgment (Dkt. No. 85) is granted as to Count I. As noted above, Gallagher represents in his opposition to CNH's summary judgment motion that he intends to file a motion to voluntarily dismiss, with prejudice, Count II of the complaint. Accordingly, Gallagher shall file his motion by April 8, 2024. With the granting of that motion, all claims would be resolved such that final judgment may be entered.

ENTERED:

Dated: March 31, 2024

_____
Andrea R. Wood
United States District Judge